J-S47011-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: B.T.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.M., FATHER | : | No. 839 MDA 2020 |

Appeal from the Decree Entered May 21, 2020
In the Court of Common Pleas of Lancaster County
Orphans' Court at No:  2019-02489

BEFORE:   STABILE, J., NICHOLS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY STABILE, J.:              **FILED DECEMBER 16, 2020**

M.M. ("Father") appeals from the decree entered May 21, 2020, which terminated involuntarily his parental rights to his son, B.T.F. ("Child").[1]  After careful review, we affirm.[2]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The orphans' court entered a separate decree terminating the parental rights of Child's mother, K.F. ("Mother").  Mother appealed at Superior Court docket number 857 MDA 2020.  We address her appeal in a separate memorandum.

[2] The orphans' court based its order in part on information contained in Child's dependency record.  While the court incorporated the dependency record as part of the termination proceedings, it did not enter a copy of the record as an exhibit, and Father did not appeal from any dependency orders.  Thus, this Court did not receive the dependency record to review for this appeal.  For the reasons discussed below, however, the evidence was sufficient to support the court's decision, even in the absence of the dependency record.  We also note that it was Father's responsibility to ensure that the record before this Court was complete.  **See** Pa.R.A.P. 1921, Note ("All involved in the appellate process have a duty to take steps necessary to assure that the appellate court has a complete record on appeal, so that the appellate court has the materials

The Lancaster County Children and Youth Social Services Agency ("the Agency") became involved with Child at the time of his birth in March 2018, after receiving a report that Child was experiencing withdrawal symptoms due to prenatal exposure to "substances." N.T., 2/6/20, at 6. The Agency devised a safety plan, providing that Child's maternal grandmother would supervise all contact between Mother and Child. *Id.* at 5. Mother allegedly violated the safety plan by leaving her home with Child and without the supervision of the maternal grandmother. *Id.* As a result, the Agency obtained custody of Child in June 2018 and placed him in foster care. *Id.* at 4.

At the time the Agency obtained custody of Child, it was not aware of Father's identity. The Agency identified Father in September 2018, confirmed his paternity via a paternity test, and provided him with child permanency plan goals. *Id.* at 10-11. While Father complied with his goals to some extent, by completing biopsychosocial and parenting capacity evaluations, he largely failed to address the Agency's concerns. *Id.* at 11. Most critically, he failed to address his significant history of substance abuse. Father admitted to using heroin as recently as August 2019, and his ongoing failure to comply with substance abuse treatment resulted in two probation/parole[3] violations and accompanying periods of incarceration. *Id.* at 13-14, 18-19, 71-72. Father

necessary to review the issues raised on appeal. Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.").

[3] There was conflicting testimony as to whether Father was on probation or parole. *See* N.T., 2/6/20, at 14-15, 19, 36, 78.

was incarcerated in May 2019, released in July 2019, and incarcerated again in August 2019. *Id.* at 13-14, 18. He was released in December 2019 and went to a rehabilitation facility, which discharged him successfully on February 4, 2020. *Id.* at 14.

Meanwhile, on October 11, 2019, the Agency filed a petition to terminate Father's parental rights to Child involuntarily. The orphans' court conducted a hearing to address the petition on February 6, 2020. Following the hearing, on May 21, 2020, the court entered its decree terminating Father's parental rights. Father timely filed a notice of appeal on June 17, 2020, along with a concise statement of errors complained of on appeal.

Father now raises the following claims for our review:

I. Whether the [orphans' c]ourt erred when it terminated Father's rights?

II. Whether the [orphans' c]ourt erred in concluding that the . . . Agency had met its burden in proving that Father's parental rights should be terminated when there was evidence that he had been actively working on and completing the goals on his child permanency plan[?]

III. Whether the [orphans' c]ourt erred in finding that terminating Father's parental rights would best serve the needs and welfare of the child?

Father's Brief at 7 (suggested answers omitted).

We review Father's claims pursuant to the following standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs the involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

. . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Here, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). In this case, we focus on Section 2511(a)(2) and (b), which provide:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

\*\*\*

23 Pa.C.S.A. § 2511(a)(2), (b).

We begin by addressing the termination of Father's parental rights to Child pursuant to Section 2511(a)(2), which Father challenges in his first and second claims.

. . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. . . . [T]hose grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). "[A] parent's incarceration is relevant to the [S]ection [2511](a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (citation omitted).

In his brief, Father maintains that the orphans' court should not have terminated his parental rights because of the progress he was making toward completing his child permanency plan goals. Father's Brief at 10-18. Father emphasizes that he completed substance abuse treatment, had a source of income in the form of Social Security payments, was compliant with the terms of his probation/parole, and was visiting Child. *Id.* at 13-18. He also notes that he did not know he was Child's father until several months after Child entered foster care, and that he was incarcerated for periods of time, which limited his ability to complete his goals. *Id.* at 13, 17.

The orphans' court explained its decision to terminate Father's parental rights pursuant to Section 2511(a) as follows, in relevant part:

Father was granted a child's permanency plan with a goal of reunification with the [c]hild. The greatest concerns for Father are his struggle with illegal drugs and his related criminal activities. By the time the termination of parental rights hearing concluded, the [c]hild was nearly twenty-three months of age. Father failed four drug and alcohol rehabilitation programs before successfully completing the program at Conewago Pottsville just two days before the final termination of parental rights hearing. Father spent the greater part of the [c]hild's life to that point in drug rehabilitation programs or in prison. It was projected that Father would need to reside in a recovery house for at least six months after the hearing ended while participating in intensive outpatient counseling. Father would remain unavailable to the [c]hild during that time. Based upon Father's history in this case, Father's request for yet more time to be ready to parent is a request the court cannot in good conscience grant. For more than a year and a half, Father squandered the opportunities the Agency provided to him to correct his incapacity to parent. It is doubtful whether Father can remedy his parenting deficits within six months or, for that matter, ever.

Orphans' Court Opinion, 7/16/20, at 17-18.

The record supports the decision of the orphans' court. As summarized above, the Agency did not know Father's identity at the time Child entered foster care. The Agency first identified Father in September 2018, confirmed his paternity via a paternity test, and provided him with child permanency plan goals. N.T., 2/6/20, at 10-11.

Father's most significant goal was to address his history of substance abuse. However, Father did not receive substance abuse treatment until the eve of the termination hearing. The Agency caseworker, Jacqueline McNelis, testified that Father engaged with at least four different treatment providers or recovery houses between November 2018 and August 2019, and either

failed to attend, left, or was asked to leave each one.[4]  *Id.* at 13-14.  Father's

failure to obtain appropriate treatment also resulted in two probation/parole

violations and accompanying periods of incarceration.  *Id.* at 13-14, 19, 78.

Ms. McNelis explained that Father was incarcerated in May 2019 and released

in July 2019, only to be incarcerated again in August 2019.  *Id.* at 13-14, 18.

He was released in December 2019 and went to a rehabilitation facility, which

discharged him successfully on February 4, 2020, only two days prior to the

hearing.  *Id.* at 14.

Despite Father's successful discharge from the rehabilitation facility, it

was clear that his substance abuse history remained unresolved.  Ms. McNelis

testified that Father began residing at a recovery house after his discharge,

and that his probation/parole officer was recommending that he stay there for

at least six months while receiving intensive outpatient treatment.  *Id.* at 14-

15.  Father testified that he was court-ordered to stay at the recovery house,

and that he would be there for "[f]ive or six months."  *Id.* at 68.  Notably,

_____

[4] The orphans' court appears mistaken in its assertion that Father "failed four drug and alcohol rehabilitation programs," which it indicates elsewhere in its opinion occurred "between November 29, 2018, and August of 2019." Orphans' Court Opinion, 7/16/20, at 10, 17.  Ms. McNelis testified that Father completed an intake at Pennsylvania Counseling Services in November 2018 but left against medical advice.  N.T., 2/6/20, at 13.  Father then completed an assessment at T.W. Ponessa in March 2019 but failed to attend his follow-up appointment.  *Id.*  Father had another appointment with Pennsylvania Counseling Services in July 2019, but Ms. McNelis was not able to confirm whether he attended or not.  *Id.*  Next, Father entered a recovery house but was asked to leave in August 2019, "due to not following the rules[.]"  *Id.* Father entered another recovery house later that same month but was asked to leave for the same reason.  *Id.*

Father stated that he completed rehabilitation programs twice before, in 2016 and 2017, and that he had relapsed quickly each time. *Id.* at 82-83. He acknowledged that he last used heroin in August 2019, which would have been shortly before his most recent incarceration, and "doesn't really know a lot of coping skills about recovery," but maintained that he was attending Narcotics Anonymous meetings and attempting to learn those skills. *Id.* at 71-72, 80-81.

Accordingly, while Father argues on appeal that he was making progress toward the completion of his child permanency plan goals, and that he was disadvantaged by a lack of time to make further progress, the record belies this contention. Father had over a year to address his goals by the time of the termination hearing in February 2020. Far from making progress, Father used heroin as recently as August 2019, and it appears that only becoming incarcerated later that month intervened to stop his substance abuse and set him on the path toward obtaining necessary treatment. Given Father's history of completing rehabilitation programs and then relapsing, and given that he would need to remain at his recovery house for another five or six months, it was within the discretion of the orphans' court to conclude that he remained incapable of parenting Child, and that he could not or would not remedy his parental incapacity pursuant to Section 2511(a)(2).

We next turn our attention to Father's third claim, in which he challenges the termination of his parental rights to Child pursuant to Section 2511(b). The requisite analysis is as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

Father's argument regarding Section 2511(b) consists of two sentences, with no citation to relevant legal authority. Thus, Father has waived this claim. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("[T]his Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.").

Even if Father had not waived this claim, it would be meritless. Father contends that the Agency presented inadequate evidence regarding Child's needs and welfare. Father's Brief at 18. He emphasizes that, although Child's

guardian *ad litem* stated Child was bonded with his foster family,[5] "no bonding assessment was completed, the resource family did not testify, and very little testimony was presented regarding the resource family and their home." *Id.*

The orphans' court explained its decision to terminate Father's parental rights pursuant to Section 2511(b) as follows:

> Father's history of visitation with the [c]hild, with the concomitant opportunity to build a bond between them, is stronger than Mother's. There was some indication in the testimony that Father's visits with the [c]hild (which did not go well at the outset) had improved. Nonetheless, during those periods of time when Father was not incarcerated or otherwise impeded from participating in visits with the [c]hild, he managed to attend only 67% of the time, which, in the court's view, is a failing grade. When the court weighs the damage to the [c]hild of severing the Father/Child bond against the harm to the [c]hild which would flow from the [c]hild's removal from his resource family (where he has thrived since June, 2018), the answer to the necessary inquiry is crystal clear.
>
> The [c]hild deserves a nurturing, loving and stable home. The [c]hild enjoys a home possessing these characteristics with the resource family. It is in the [c]hild's best interest that . . . Father's parental rights be terminated so the [c]hild will have permanency and a loving family to support all of his needs.

Orphans' Court Opinion, 7/16/20, at 21-22.

The record once again supports the decision of the orphans' court. As we have explained, Child did not live with Father after his birth and the Agency did not identify Father until September 2018, approximately three months

---

[5] Specifically, Father refers to the guardian *ad litem's* argument in support of termination at the conclusion of the hearing, which she based in part on her assertion that Child shared a bond with his foster family. *See* N.T., 2/6/20, at 105-07.

- 11 -

after Child entered foster care. N.T., 2/6/20, at 4, 10. In addition, although Father attended visits with Child, the record confirms that his attendance was inconsistent. Ms. McNelis testified that Father had the opportunity to attend one visit with Child each week for two hours. *Id.* at 18. Visits began at the Agency and then moved to the Bethanna visitation program. *Id.* Bethanna discharged Father after he was incarcerated in May 2019, but visits resumed at the Agency in July 2019, after he was released. *Id.* at 13, 18. Ms. McNelis explained that Father attended nineteen out of his twenty-six possible visits at Bethanna and two out of his four possible visits after they resumed at the Agency.[6] *Id.* at 18-19. Following Father's incarceration in August 2019, he visited with Child only three additional times, in September 2019, November 2019, and January 2020. *Id.* at 17-18.

---

[6] The orphans' court believed erroneously that Father had five opportunities to visit at the Agency, which appears to be the cause of its statement that Father visited Child "only 67% of the time." Orphans' Court Opinion, 7/16/20, at 11, 21. Ms. McNelis testified regarding this issue as follows:

> When [Father] was released from Lebanon County, visits resumed at the Agency on July 31st of 2019, and he -- [Father] had a visit on the 31st and then August 8th of 2019. He was scheduled for August 15th, but he called the day of the visit to cancel due to a job interview. He was scheduled for the following week, on August 22nd, 2019, but he was a no call, no show.
>
> And then the following week he was incarcerated at the Lebanon County Prison on August 26th of 2019.

N.T., 2/6/20, at 19.

Predictably, the record does not indicate that Father and Child exhibited a meaningful bond during their limited number of visits together. Ms. McNelis testified that Child cried for the majority of Father's "first few" visits and cried for the first ten to fifteen minutes of the subsequent visits, although he then calmed down "easily." *Id.* at 19. As visits continued, Child "seemed to be a little bit more comfortable with" Father. *Id.* at 20. Ms. McNelis explained that she last observed a visit in August 2019, and that it "went well" overall. *Id.* at 37. In contrast to Child's minimal contact with Father, Ms. McNelis agreed that Child had spent his entire placement in foster care residing with the same pre-adoptive foster family, and that he did not "know anyone else . . . as a "parental role model[.]" *Id.* at 20-21.

Thus, despite Father's arguments to the contrary, we conclude that the Agency presented sufficient evidence regarding Section 2511(b). While Father contends that the orphans' court did not have the benefit of an expert bonding assessment when reaching its decision, no such assessment was necessary. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010), *reargument denied* (May 28, 2010) ("When conducting a bonding analysis [pursuant to Section 2511(b)], the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well.") (citations omitted). While Father also maintains that the Agency did not present adequate testimony regarding Child's pre-adoptive foster family, our law does not require that pre-adoptive foster parents testify, or that an agency present a specific amount of

evidence regarding a pre-adoptive foster family or its home. Indeed, a court may grant an agency's termination petition even in the absence of a pre-adoptive placement. *See In re K.C.F.*, 928 A.2d 1046, 1052-54 (Pa. Super. 2007), *appeal denied*, 936 A.2d 41 (Pa. 2007) (affirming termination where the children were not in pre-adoptive placements). In light of Child's young age, his minimal contact with Father, and Father's significant and unresolved history of substance abuse, we see no basis to disturb the court's decision that termination of Father's parental rights would best serve Child's needs and welfare. *See C.D.R.*, 111 A.3d at 1220 ("Clearly, it would not be in Child's best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent.").

Based on the foregoing, the orphans' court did not abuse its discretion or commit an error of law by terminating Father's parental rights involuntarily. Therefore, we affirm the court's May 21, 2020 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2020